UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    No. 13-cr-70(3) (JRT/LIB)

v.                                           **REPORT AND RECOMMENDATION**

(3) Frederick Tibbetts,
    a/k/a "Bud Tibbetts,"

                 Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Dismiss the Indictment, [Docket No. 119]; his Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery, [Docket No. 116]; and his Motion to Suppress July 23, 2011 Statements, Admissions, and Answers, [Docket No. 104]. The case has been referred to the Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on July 2, 2013, regarding the Defendant's motions for discovery,[1] dismissal, and suppression. For reasons outlined below, the Court recommends the motions be **DENIED**.


I.      **BACKGROUND**

Frederick W. Tibbetts, a/k/a "Bud Tibbetts" ("Defendant"), is an enrolled member of the White Earth Band of Chippewa Indians, and is one of four persons charged with one count each of Transportation, Sale and Purchas of Fish Taken in Violation of Tribal Law, in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1), and Leech Lake Band of Chippewa Indians Conservation Code §§ 22.01(2) and 23.01. (Indictment [Docket No. 1] at 2-4). Defendant was indicted on

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 137].

April 9, 2013, and made the present motions on June 20, 2013.  The Court held an evidentiary hearing on July 2, 2013, and accepted evidence concerning the suppression motion; the parties were allowed additional time for briefing, and both Defendant and the Government provided supplemental briefs.  (See Docket Nos. 139-40, 144).  Defendant is presently scheduled to go to trial before the Hon. John R. Tunheim on September 23, 2013.  (See Order [Docket No. 131]).

## II.  DEFENDANT'S MOTIONS TO DISMISS

### A. Defendant's Motion to Dismiss the Indictment [Docket No. 119]

Defendant Tibbetts was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[2]  Defendant Tibbetts is one of ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal prosecutions").[3]

---

[2] See Def.'s Mot. Dismiss for Selective Prosecution, Ex. [Docket 116-1], at 2.
[3] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

Defendant here first argues that the Lacey Act does not apply to Indians.  In the alternative, Defendant argues that, even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties.  (See Docket No. 119).[4]

### 1.  The Lacey Act applies to Indians.

Defendant argues that Congress never intended the Lacey Act to apply to Indians.  The Court cannot agree with this argument, which is clearly contrary both to the plain language of the Lacey Act and to binding Eighth Circuit precedent.  United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter "Big Eagle II") ("the Lacey Act, by its terms and definitions, applies to Indian people" (citing 16 U.S.C. § 3371(e) ("The term 'person' includes any individual . . . subject to the jurisdiction of the United States")).  The Eighth Circuit's holding in Big Eagle II is consistent with the Ninth Circuit's decision in United States v. Sohappy. 770 F.2d 816 (9th Cir. 1985).  Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally obtained fish to the stiffer Lacey Act penalties was to allow the Federal Government to provide more adequate support for the full range of laws that protect wildlife.

---

The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

[4] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions.  (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. . . . To exempt Indians from these penalties would impede attainment of Congress' goal.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[5]

Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians. Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

### 2. The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

### a. Standard of Review

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)). A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence. Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)). However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right." Id. (citing United States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)). The Eighth Circuit has repeatedly described

---

[5] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians. The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians. This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

4

the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one." Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

> **b. Discussion**

The Court begins with the issues that are not in dispute. First, in the present case, neither party disputes that the Chippewa Indians[6] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty. "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'" United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990). "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned. Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty." 1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted). "Such treaty rights can be asserted by . . . an individual member of the Tribe." United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, although Defendant Tibbetts argues that his prosecution under the Lacey Act is a violation of his treaty rights, Defendant *does not challenge* the Leech Lake Conservation Code sections that constitute the predicate offenses for his Lacey Act prosecution, nor does he challenge the application of those Code sections to him. In fact, Defendant expressly acknowledges tribal authority to regulate fishing within its territorial jurisdiction. (Mot. Dismiss

---

[6] Also known as Ojibwe or Anishinabe.

Indictment [Docket No. 59, 119, 67, 32], at 1 ("[T]he Chippewa tribes have a treaty-guaranteed right to control hunting, fishing and gathering on tribal lands, including Leech Lake")).

Finally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability.  Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'"  <u>United States v. Wadena</u>, 152 F.3d 831, 846 (8th Cir. 1998) (quoting <u>Sohappy</u>, 770 F.2d at 819 (9th Cir. 1985) (quoting, in turn, <u>United States v. Burns</u>, 529 F.2d 114, 117 (9th Cir. 1975))).  If a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, the court next asks whether that treaty right was abrogated by Congress.  A court generally will find that Congress has abrogated a treaty right only where there is explicit statutory language doing so.  <u>Dion</u>, 476 U.S. at 738-39 (collecting cases).

The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his treaty right to take fish on the Leech Lake Reservation—a right that the Government acknowledges Defendant has.  Rather, the Court must begin with this question: Does Defendant's treaty right exempt him from the operation of the Lacey Act?

> ### i. The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.

> #### (a) <u>Sohappy</u> and <u>Stone</u>

The Ninth Circuit, in <u>Sohappy</u>, was the first court to address this question in detail, and it found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act.  770 F.2d at 820.  The defendants in <u>Sohappy</u> were convicted of violating the Lacey Act by catching and selling fish in violation of tribal and state law.  <u>Id.</u> at 817.  They appealed, arguing

"that federal prosecution of Indians for violations of tribal fishing law violates Indian sovereignty and Indian treaty reserved fishing rights."  Id.

The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is necessarily limited and must not conflict with the overriding sovereignty of the United States." Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by authorizing federal penalties for violations."  Id. at 819-20.  Furthermore, it held that a Lacey Act prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty reserved right to exercise *exclusive* jurisdiction over such fishing matters.  Nor is there "specific language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability throughout the United States.'"  Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and alterations in Sohappy).

The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in United States v. Stone. 112 F.3d 971 (8th Cir. 1997).  In Stone, the defendant, an enrolled member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne Hunting Act[7] on the White Earth Indian Reservation.  112 F.3d at 972.  He appealed, arguing in part that "the treaties between the Chippewa Indians and the United States vested the tribes with jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be federally prosecuted for hunting on the reservation."  Id. at 973.  The Eighth Circuit, citing Sohappy with approval, rejected this argument:

> As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters."  United States v. Sohappy, 770 F.2d 816,

---

[7] 16 U.S.C. § 742j-l.

820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." Id. at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." Burns, 529 F.2d at 117; Sohappy, 770 F.2d at 820 (quoting Burns, 529 F.2d at 117). . . . [A]s in Sohappy, federal jurisdiction under the Airborne Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for violations," and its enforcement against an Indian on Indian land is proper. Id. at 819-20.

Stone, 112 F.3d at 973-74.

Defendant argues that neither Sohappy nor Stone controls the present case. First, Defendant argues that Sohappy is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'" 770 F.2d at 819. In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations. Defendant misses the point. The issue described by the court in Sohappy was whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians." 770 F.2d at 818. Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues Stone is inapplicable because it did not concern fishing rights. The Court is not persuaded. Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary rights he was guaranteed by one or more treaties. Defendant offers no reason, and the Court can think of none, that the distinction between hunting and fishing would be material.

### (b) **Big Eagle I** and **II**.

Three years after the Ninth Circuit decided <u>Sohappy</u>, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case.  In <u>Big Eagle I</u>, the defendant was an enrolled member of the Crow Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code.  684 F. Supp. at 242-43.  The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did.  684 F. Supp. at 244.  The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law.  <u>Id.</u> at 246 ("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues.  Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations.  <u>Id.</u> at 245.  Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights.  <u>Id.</u> at 244-46.[8]

---

[8] Although the Eighth Circuit did not specifically address this argument in <u>Big Eagle II</u>, it did affirm the District Court's denial of the defendant's motion to dismiss.

**(c) Defendant presents <u>no</u> case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.**

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act. Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of <u>Big Eagle I</u>, but instead argues that <u>Sohappy</u>, <u>Stone</u>, and <u>Big Eagle</u> (presumably both <u>I</u> and <u>II</u>) were effectively reversed by the U.S. Supreme Court's decision in <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172 (1999). However, <u>Mille Lacs</u> has no bearing on the present case, for two reasons: First, <u>Mille Lacs</u> did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary rights that were addressed in <u>Stone</u>, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory." 526 U.S. at 204. Defendant is charged with an on-reservation offense.[9] Thus, <u>Mille Lacs</u> does not apply.

Second, <u>Mille Lacs</u> held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy. Today, *this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands.*

<u>Id.</u> (emphasis added). "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation." <u>Big Eagle</u>, 684 F. Supp. at 244 (citing <u>Sohappy</u>, 770 F.

---

[9] The Indictment alleges that Defendant violated the Leech Lake Conservation Code; thus, he is charged under the Lacey Act for an alleged violation of "Indian tribal law." <u>See</u> 16 U.S.C. § 3372(a)(1). The Lacey Act "Indian tribal law" provision applies only to conduct "within Indian country defined in section 1151 of title 18." 16 U.S.C. § 3371(c).

Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974). In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a). White, 508 F.2d at 454. The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds. Id. at 454, 457. In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a tribal wildlife law. Thus, in White the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the Leech Lake Band's Conservation Code legitimately limits the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act. See Wadena, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### ii. Summary

"Tribal wildlife laws are *per se* valid against tribe members." United States v. Williams, 898 F.2d 727, 729 (9th Cir. 1990); see also Big Eagle I, 684 F. Supp. at 244-46.[10] In fact, Defendant does not challenge the authority of the Leech Lake Band's Conservation Code. Thus,

---

[10] A tribal wildlife law is also valid against tribe members of other tribes. See Big Eagle I, 684 F. Supp. at 244-46.

it is the Conservation Code that specifies how Defendant may exercise his right to fish. Additionally, "the exercise of federal jurisdiction under the Lacey Act . . . supports tribal laws by authorizing federal penalties for violations." Sohappy, 770 F.2d at 819-20; see also Big Eagle I, 684 F. Supp. at 244 ("[t]he federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation").[11] Defendant's attempts to distinguish Sohappy, Stone, and Big Eagle are unavailing. Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Chippewa Indian tribes, and (2) the Federal Government has concurrent jurisdiction with regard to enforcement of tribal wildlife regulations affecting that right.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of tribal wildlife law. Because Defendant's treaty right does not exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right. See Wadena, 152 F.3d at 846.

---

[11] Defendant argues that, under United States v. Jackson, 600 F.2d 1283 (9th Cir. 1979), the federal government lacks the authority to prosecute a violation of a tribal wildlife ordinance. However, Jackson is easily distinguished from the present case, as the nature of the federal statute at issue in Jackson is very different from the Lacey Act. In Jackson, the prosecution was brought under 18 U.S.C. § 1165, "which provides:

> Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any . . . Indian tribe, . . . for the purpose of hunting, . . . shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

Jackson, 600 F.2d at 1284 (quoting 18 U.S.C. § 1165). Thus, in Jackson, the defendant, who was an enrolled member of the Confederated Tribes of the Umatilla Reservation, was in essence charged with a trespass upon Indian land—an Indian-on-Indian crime. The Jackson court held that "in the absence of an explicit Congressional directive, Indian tribes have exclusive criminal jurisdiction over offenses committed by one Indian against another Indian." 600 F.2d at 1285.

By contrast, in the present case Defendant is not charged with committing an offense against another Indian, but instead is charged with committing an offense "against tribal law and federal law (through the Lacey Act's incorporation of tribal law) designed to preserve fishing opportunities of Indians *and* non-Indians." Sohappy, 770 F.2d at 819 (emphasis in original).

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Leech Lake Indian Reservation—exempts him from the operation of the Lacey Act.  Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 119], be **DENIED**.

**B.  Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 116]**

Defendant Tibbetts alleges that he is a victim of selective prosecution and moves for dismissal, or, in the alternative, for additional discovery into the alleged selective prosecution. (See Docket No. 116).

**1.  Standard of Review**

"In order to make a prima facie case of selective prosecution, [a defendant] must show: (1) people similarly situated to him were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose."  United States v. Hirsch, 360 F.3d 860, 864 (8th Cir. 2004) (citing United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998)).  The defendant "has the burden of proving the government engaged in selective prosecution."  Id. (citing United States v. Kelley, 152 F.3d 881, 885 (8th Cir. 1998)).  "The 'evidentiary burden is a heavy one.'"  United States v. Peterson, 652 F.3d 979, 981 (8th Cir. 2011) (quoting United States v. Leathers, 354 F.3d 955, 961-62 (8th Cir. 2004)).

A defendant seeking discovery regarding his selection prosecution claim "must present some evidence that tends to show the existence of both elements."  United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998) (citing United States v. Armstrong, 517 U.S. 456, 468-69 (1996)). "The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such claim."  Armstrong, 517

U.S. at 468; see also United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012) ("Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment; rather than presenting clear evidence, the 'defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent" (quoting United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996) (quoting, in turn, Armstrong, 517 U.S. at 470))).

### 2. Facts

Defendant was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties. (Def.'s Mot. Dismiss Selective Prosecution, Exhibit [Docket No. 116-1], at 1-3).[12]

Defendant Tibbetts is one of ten persons who were indicted in four separate Federal cases; in each of these Federal prosecutions, the government has alleged violations sufficient to invoke criminal penalties, subjecting the Defendants to a potential fine of up to $20,000.00, and/or a potential prison sentence of up to five years. Of the ten individuals charged in these separate Federal prosecutions, four are identified in the various indictments as Indians and three others self-identify as Indians in various pleadings.[13]

---

[12] Defendant's exhibits, [Docket No. 116-1] are not individually numbered. They consist of the following:
- **At 1**: Minnesota Dep't Natural Res., Operation Squarehook – State charges by county (undated).
- **At 2-4**: Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013).
- **At 5-7**: Minnesota Dep't of Natural Resources, "Operation Squarehook: Investigation of illegal sales of game fish results in more charges," Brainerd Dispatch, April 15, 2013 (printed from internet).
- **At 8-10**: Bill Hudson, "31 charged As DNR Nets Walleye Poaching Ring," WCCO, April 15, 2013 (printed from internet).

[13] For the information in this paragraph, see fn.3, supra.

Defendant proffers that State prosecutors in six counties have charged a total of twenty-one persons with various misdemeanor and gross misdemeanor charges. (Def.'s Ex. at 1). Defendants in the State prosecutions are subject to a possible fine of not less than $3,000.00 and not more than $10,000, and/or a potential jail sentence of not less than ninety days and not more than one year. See Minn. Stat. §§ 97A.301, 97A.325. There is no evidence in the record offered by the movant identifying any of the defendants in the State prosecutions, stating one way or the other definitively whether any of them are Indian, or suggesting that the factual circumstances in the State prosecutions are substantially identical to those of the present case.

**3. Discussion**

In moving to dismiss on the basis of an allegation of selective prosecution, Defendant has the burden of proving both that persons similarly situated to him were not prosecuted, and that the prosecution decisions were made with a discriminatory purpose or intent. Hirsch, 360 F.3d at 864. Because, on the present record, Defendant has shown no evidence of either necessary factor in order to meet his initial burden, he has failed to demonstrate that he is entitled to dismissal of the Indictment or that he should be entitled to any additional discovery on the subject.

**a. Defendant has not shown that he was treated differently from similarly situated persons.**

First, Defendant has failed to identify any similarly situated persons who were **not** prosecuted. "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." Venable, 666 F.3d at 900-01 (citing Olvis, 97 F.3d at 744). Defendant appears to argue solely and conclusorily that the twenty-one persons subject to the State prosecutions are similarly situated to him. Presumably Defendant contends that the State defendants are similarly situated on the sole basis that they may have been identified in the same

Operation Squarehook investigation.[14]  But there is little, if any, evidence in the present record that those persons are, in fact, similarly situated to Defendant.  For example, the Lacey Act makes it illegal "to import, export, transport, sell, receive, acquire, or purchase any fish . . . taken, possessed, transported, or sold *in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law*."  16 U.S.C. § 3372(a)(1) (emphasis added).  Defendant has not demonstrated that any of the subjects of the State prosecutions—or any other person he conclusorily asserts may be similarly situated to himself—violated any Federal or Tribal law or regulation, as opposed to violating only State law.

In fact, for a Federal prosecutor deciding whether to prosecute two persons, the mere fact that a state authority has elected to prosecute one of them may be a "legitimate prosecutorial factor" serving to distinguish the two.  Id. at 901.

Because Defendant has failed to meet his threshold burden to show clear evidence, much less any credible evidence, to demonstrate that he was treated differently from other similarly situated persons—or even that there *are* any persons similarly situated to Defendant for purposes of the present case—he has failed to show selective prosecution.

      **b.  Even if Defendant had identified similarly situated persons <u>and</u> shown that he was treated differently from them, he nevertheless has failed to demonstrate that any such differentiation was the result of a discriminatory improper motive.**

Defendant argues that he and other Indians were subjected to Federal prosecution, while non-Indians were instead subjected only to State prosecution.  (See Mot. Dismiss Selective Prosecution [Docket No. 116]).  He alleges that this alone is evidence of a racially discriminatory

---

[14] The precise contours of Defendant's argument are not entirely clear, because he does not identify the *specific* persons he believes are similarly situated to himself.  Defendant appears to argue that the twenty-one persons prosecuted by the State are the similarly situated persons; thus, he does not argue that the similarly situated persons were *not prosecuted*, but, rather, argues that those persons were *prosecuted by the State and not the Federal government*, and, as a result, were subjected to potentially lesser penalties than he.

motive in the federal charging decisions.  (Id.).  However, in addition to his previously addressed failure to demonstrate even some credible evidence that the defendants in the State prosecutions actually *are* similarly situated to him,[15] Defendant also fails to demonstrate any evidence in the record to show beyond mere allegation that any charging differentiation is the result of improper motive.

Defendant appears to start from the flawed premise that any distinction in the prosecutions of Indian tribal members and non-Indians is necessarily per se an impermissible "racial" distinction.  In fact, the federal courts have repeatedly held that treating Indian tribal members differently from non-Indians for incidents arising in Indian country does not violate either due process or equal protection.  See, e.g., United States v. Antelope, 430 U.S. 641, 646-47 (1977) (holding that "respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe. We therefore conclude that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications."); Fisher v. District Court, 424 U.S. 382, 390 (1976) (in civil case, "we reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination.  The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law."); United States v. Aanerud, 893 F.2d 956, 960 (8th Cir. 1990) (upholding prosecution of non-Indians for harvesting leeches on the White Earth Reservation against selective prosecution challenge because "members of the White Earth Band and non-members are simply not similarly situated with regard to their respective rights to trap leeches within the confines of the Reservation.")

---

[15] See Part II.B.3.a, supra.

Defendant also fails to prove that there is any "racial" distinction between himself and the other Indian tribal member Defendants in the four separate Federal prosecutions, on the one hand, and the subjects of the State prosecution on the other hand.  Defendant offers only a news report that states that "[t]en members of the Red Lake and Leech Lake bands are charged in Federal Court," while "another 21 non-tribal buyers and sellers are now facing state charges." (Def.'s Ex. at 9).[16]  The superficial, perfunctory news article representation of the "racial" make-up of the Defendants in the Federal prosecutions compared to the State prosecutions on which Defendant relies is at odds with the evidence in the record which shows only seven of the ten Federal defendants in the four separate Federal prosecutions are identified as Indian.  See fn.3, supra.  If the news report upon which Defendant relies does not even accurately reflect whether all, or only some, of the Defendants in the four separate Federal prosecutions are Indian, then the same article cannot be a credible source of evidence as to accurately reflect whether all, or only some, of the subjects of the State prosecutions are non-Indian.  Defendant has the burden of proving selective prosecution, and he might have examined the actual case files of the defendants in the State prosecutions to ascertain whether there is evidence to demonstrate their racial makeup.  However, Defendant has not done so on the present record.

Finally, even assuming, *arguendo*, that Defendant had demonstrated that there was a clear racial distinction between himself and other Defendants in the Federal prosecutions, and those persons subject to the State prosecutions, "'[t]o establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not

---

[16] See also Def.'s Ex. [Docket No. 116-1], at 6 (describing Defendants in the federal prosecutions as "10 tribal members").

Defendant states that "at least eight of the ten federal defendants are Native American, and are enrolled members of an Indian tribe in the state of Minnesota."  (Mot. Dismiss Selective Prosecution [Docket No. 116] at 1). Defendant does not account for the discrepancy between his count of eight Indian defendants, and the seven who are identified as Indian in the record.

enforced against them.'"  See United States v. Hare, 308 F. Supp. 2d 955, 991 (D. Neb. 2004) (with regard to selective enforcement defense) (quoting United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996)).  Defendant has not even demonstrated that any of the subjects of the State prosecutions violated the Lacey Act and were not prosecuted in Federal court, and, therefore, Defendant has failed to demonstrate any actual discriminatory effect on the present record.

Because Defendant Tibbetts has failed to show either of the two material elements necessary to dismiss an indictment on the basis of selective prosecution, the Court recommends that his Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery, [Docket No. 116], be **DENIED**.

### III.    DEFENDANT'S MOTION TO SUPPRESS JULY 23, 2011, STATEMENTS, ADMISSIONS, AND ANSWERS [Docket No. 104]

Defendant argues that the Court should suppress his statements to law enforcement made on July 23, 2011, because he was in custody when he made those statements.

### A.  Facts[17]

Early on the afternoon of July 23, 2011, U.S. Fish and Wildlife Service Special Agent James Persson ("SA Person") and Minnesota Department of Natural Resources Lieutenant Todd Kanieski ("Lt. Kanieski") (together, the "interviewing officers"), were stopped near the intersection of U.S. Highway 2 and County Road 8, in Bena, Minnesota, when Defendant walked past them.

---

[17] The facts in this Part are derived from the testimony of U.S. Fish and Wildlife Service Special Agent James Persson ("SA Person") at the July 2, 2013, motions hearing, and from **Government's Exhibit 1**: a compact disc that contains a recording of the interview that SA Persson and Minnesota Department of Natural Resources Lieutenant Todd Kanieski ("Lt. Kanieski") conducted with Defendant on July 23, 2011, which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

The interviewing officers had been on the lookout for Defendant as part of their ongoing investigation into illegal trafficking in fish on the Leech Lake and Red Lake Indian Reservations. The interviewing officers recognized Defendant as a target of their investigation, and as he walked past their vehicles, SA Persson asked Defendant if he would be willing to speak with them. Defendant said that he wanted to purchase tobacco from the store across the highway, and continued walking past the interviewing officers approximately 20 to 40 yards; however, before reaching the store, Defendant turned around and walked back toward the interviewing officers. SA Person asked again if Defendant would speak with the interviewing officers, and Defendant agreed. SA Persson informed Defendant that he was not under arrest, and that his participation in the interview was voluntary.[18] Shortly thereafter, Lt. Kanieski began recording the interview.

The recorded portion of the interview lasted approximately 1 hour and 48 minutes, during which SA Persson and Lt. Kanieski ask Defendant a variety of questions concerning allegations of illegal fishing and trafficking in fish on the Leech Lake Indian Reservation. The interview began outside the vehicles, with Defendant at one point sitting on the tailgate of the interviewing officers' vehicle, and later the parties moved inside the vehicle to get out of the wind. The interviewing officers never raised their voices at Defendant, nor threatened him in any way. SA Persson testified that he was armed, but that his sidearm likely was not visible beneath his U.S. Fish and Wildlife Service jacket; he also testified that Lt. Kanieski wore a standard duty belt, and that his sidearm likely was visible, but that neither of the interviewing officers ever drew their sidearms. Defendant remained cordial during the length of the interview. Defendant never asked to speak with an attorney, and never asked the interviewing officers to stop questioning him.

---

[18] SA Persson testified at the July 2, 2013, motions hearing that he did not recall whether he said that Defendant was free to leave at any time.

Approximately 1 hour and 40 minutes into the recorded interview, SA Persson begins drafting a brief Affidavit summarizing the contents of the interview with Defendant.[19]

Approximately 1 hour and 47 minutes into the recorded interview, Defendant says that he wants "to go pretty soon." The interviewing officers therefore offer to take Defendant home, but he declined. Lt. Kanieski reminded Defendant that: "You don't have to sit in here. You're not, like, you're not under, you're just better out of the wind." Defendant then exits the vehicle to smoke a cigarette, and the recording stops for a break.[20]

After the break, Lt. Kanieski resumed recording, and SA Persson read the draft Affidavit to Defendant. SA Persson the gave the draft Affidavit to Defendant for his review, and told him that he could make any additions, changes, or corrections that he felt necessary, saying: "If you believe that's all true and correct, you can sign it right there." Defendant initialed and signed the Affidavit at 2:39 p.m.

The first recorded interview lasted approximately 1 hour and 48 minutes. The second recording, which merely documents the Affidavit, lasted approximately 6 minutes and 22 seconds. Including the brief exchanges before the first recording and the break between the two recordings, the entirety of the interview of Defendant lasted a little longer than 2 hours.

Defendant was not arrested at the conclusion of the interview.

## B. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436,

---

[19] At the July 2, 2013, motions hearing, this affidavit was introduced by the Government, and accepted into evidence by the Court, as **Government's Exhibit 2**.

[20] The record does not indicate how long this break lasted.

444 (1966)).  Miranda warnings are required for official interrogations where a person has been

"taken into custody or otherwise deprived of his freedom of action in any significant way."

Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

However, law enforcement officers "are not required to administer Miranda warnings to

everyone whom they question."  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  "Miranda

warnings are required only where there has been such a restriction on a person's freedom as to

render him in custody."  Id.

    The Eighth Circuit considers six (6) factors when determining whether a suspect is in

custody:

> (1) Whether the suspect was informed at the time of questioning that the
> questioning was voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered under arrest; (2) whether
> the suspect possessed unrestrained freedom of movement during questioning; (3)
> whether the suspect initiated contact with authorities or voluntarily acquiesced to
> official requests to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning; (5) whether the
> atmosphere of the questioning was police dominated; or (6) whether the suspect
> was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin,

922 F.2d 1343, 1349 (8th Cir. 1990)).  "The first three indicia are mitigating factors which, if

present, mitigate against the existence of custody at the time of questioning.  Conversely, the last

three indicia are aggravating factors which, if present, aggravate the existence of custody."

United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).  Those factors, however, are not

exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he

ultimate test is whether a reasonable person in that position would have felt free to end the

interview.'"  Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711

(8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### C. Discussion

Based on the present record in this case, the totality of the circumstances indicates that Defendant was not in custody when he was interviewed by SA Persson and Lt. Kanieski on July 23, 2011. Therefore, the interviewing officers were not required to provide the Defendant with a rights warning consistent with Miranda.[21]

SA Persson advised Defendant at the beginning of the interview that he was not under arrest and that his participation in the interview was voluntary. Thus, the first factor weighs against a finding of custody. However, because the interviewing officers never expressly told Defendant that at anytime he wished he could terminate questioning or that he was free to leave,

---

[21] Defendant makes no specific argument that the Affidavit that he signed should be suppressed. However, because the Affidavit was signed during a period that Defendant argues he was "in custody," the analysis that follows applies both to Defendant's oral statements in the interview, and to the Affidavit that he signed at the end of the interview.

this factor moves the needle only slightly.  "The first <u>Griffin</u> factor weighs heavily in favor of noncustody when the officers clearly inform a suspect that [he] is free to leave or decline questioning.  However, when officers inform a suspect only that [he] is not under arrest, the first factor is less determinative in favor of noncustody, and our analysis relies more on the other indicia of custody."  <u>Sanchez</u>, 676 F.3d at 631 (citations omitted); <u>see also</u> <u>United States v. Ollie</u>, 422 F.3d 1135, 1138 (8th Cir. 2008) (telling defendant that he is not under arrest without advising him that he may termination questioning, "while falling short of an ideal, do[es] weigh against a determination that he was in custody").

The second factor also mitigates against a finding of custody in this case, as there is no evidence that the officers denied Defendant "unrestrained freedom of movement."  Defendant argues that his freedom of movement was restricted because of the presence of the interviewing officers around him.  (Def.'s Mem. Supp. Mot. Suppress at 4).  However, the recording demonstrates that the interviewing officers began the interview in the open air along the side of the road, moving into the vehicle only later to get out of the wind; and even after the interview had moved inside the officers' vehicle, they allowed Defendant to exit the vehicle upon request to smoke.  Thus, there is no evidence in the record that would indicate that Defendant was "restrained to a degree commonly associated with arrest."  <u>Griffin</u>, 922 F.2d at 1354; <u>see also</u> <u>United States v. Mottl</u>, 946 F.2d 1366, 1370 (8th Cir. 1991) (finding second factor weighed in favor of non-custody in part because interviewing agents "did not restrain [the defendant]'s freedom of movement to a degree associated with custody or formal arrest").

The Court gives the greatest weight to the third factor, as the facts clearly demonstrate that, although the interview was initiated by law enforcement, Defendant voluntarily acquiesced to questioning.  When the interviewing officers first asked to speak with Defendant, he declined

24

and walked away toward a convenience store where he said he intended to buy tobacco. The interviewing officers did nothing to stop or pursue him. Defendant, of his own accord, turned around and walked back toward the interviewing officers. Accordingly, there is no evidence in the present record to indicate that Defendant did not voluntarily acquiesce to the questioning. Further, Defendant's conduct during the interview supports a finding that he voluntarily acquiesced to questioning. Defendant was friendly and cooperative, readily describing in great detail his past fishing activities.[22]

Turning next to the three aggravating factors, none of them weighs in favor of custody.

The fourth factor does not weigh in favor of custody, because there is no evidence that investigators engaged in strong-arm tactics or deceptive stratagems. As in Axsom, the officers were armed but did not display their weapons. Axsom, 289 F.3d at 502. The interviewing officers also did not use any deceptive stratagems, such as the good-cop, bad-cop routine. See United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993); United States v. Carter, 844 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing Miranda, 384 U.S. at 452, 455)). Moreover, the interviewing officers "asked straightforward questions and [Defendant] gave straightforward answers," Axsom, 289 F.3d at 502 (internal quotations omitted), and they did not make any promises to Defendant. Thus, the fourth factor does not weigh in favor of a finding of custody.

Nor does the fifth factor weigh in favor of a finding of custody, because the interview was not police dominated. In considering this factor, courts examine such considerations as the place and length of the interview. Griffin, 922 F.2d at 1352.

---

[22] Defendant also argues that he was suffering from broken ribs during the interview, and that the interviewing officers were aware of his pain and distress. However, the cooperative and friendly nature of Defendant's conduct during the interview belies any inference that his physical condition in any way made his acquiescence to the interview involuntary.

Defendant argues that the fact that the interviewing officers remained close to Defendant, and that part of the interview took place inside a law enforcement vehicle, created a police-dominated environment.  (Def.'s Mem. Support Mot. Suppress at 4).  However, the fact alone that Defendant was at one point sitting in a law enforcement vehicle is not per se evidence that the interview was police dominated.  The Eighth Circuit, in an unpublished case, found that the environment was not police dominated where a defendant was being transported inside an Iowa State Patrol trooper's squad car.  United States v. Hephner, 103 Fed. Appx. 41, 44, 48-49 (8th Cir. 2004).  In both Hephner and the present case, the defendants were not handcuffed as they sat in the police vehicles.  See Id. at 44.  In the present case, the environment was even less police dominated than in Hephner, as the vehicle was not a marked squad car with cage mesh and other law enforcement add-ons, but instead was an unmarked, standard vehicle.  Moreover, in the present case, the interview commenced out in the open, moving into the vehicle only to get out of the wind, and the Defendant was allowed to exit the vehicle upon request to smoke a cigarette, while in Hephner the defendant was being transported in a moving vehicle some fifteen miles away from where the initial traffic stop had occurred.  Id. at 44.

Finally, although the interview was not brief, running slightly more than 2 hours, it also was not so lengthy as to militate a finding that it was police dominated.  United States v. Czichray, 378 F.3d 822, 825, 830 (8th Cir. 2004) (interview in defendant's home lasting nearly seven hours was not custodial).[23]  Thus, the fifth factor does not weigh in favor of a finding of custody.

The sixth and final factor is the easiest to resolve: Defendant *was not arrested* at the conclusion of the interview, therefore this factor does not support a finding of custody.

---

[23] See also Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive") (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (interview lasting seven-and-a-half hours not unconstitutional)).

Upon the totality of the circumstances, the Court finds that Defendant was not in custody when he spoke with SA Persson and Lt. Kanieski on June 23, 2011. Defendant was told that he was not under arrest, he voluntarily acquiesced to questioning, and there is no evidence that his freedom of movement was restrained. The interviewing agents used no strong-arm tactics or deceptive stratagems, and the interview although lasting a little more than two hours, was not inordinately long or in any way otherwise police dominated. Finally, Defendant was not arrested at the end of the interview.

Given the totality of the circumstances, a reasonable person in Defendant's position would not "have felt that he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Moreover, the Defendant's freedom was not restrained to a degree associated with formal arrest requiring a Miranda warning. Finally, the circumstances of the interview were not so police dominated as to subvert the Defendant's free will to voluntarily participate in the interview.

The Court recommends that the Defendant's Motion to Suppress July 23, 2011, Statements, Admissions, and Answers, [Docket No. 104], be **DENIED**.

IV.    **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss the Indictment [Docket No. 119] be **DENIED**;

2. Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 116] be **DENIED**;

3.  Defendant's Motion to Suppress July 23, 2011, Statements, Admissions, and Answers

    [Docket No. 104] be **DENIED**.

Dated: August 14, 2013                              s/Leo I. Brisbois
                                                    LEO I. BRISBOIS
                                                    United States Magistrate Judge

## N O T I C E

During the briefing period following the July 2, 2013, motions hearing, upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their briefs on these Motions.  Consequently, and in light of the pending trial date of September 23, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 23, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.