## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

**Criminal No. 13-68 (JRT/LIB)**

UNITED STATES OF AMERICA,

                              Plaintiff,

v.

(1) MICHAEL D. BROWN,

                      Defendant.

**Criminal No. 13-70 (JRT/LIB)**

UNITED STATES OF AMERICA,

                              Plaintiff,

v.

(1) JERRY A. REYES, *a/k/a Otto Reyes*,
(2) MARC L. LYONS,
(3) FREDERICK W. TIBBETTS, *a/k/a Bud Tibbetts*,

                      Defendants.

**MEMORANDUM OPINON AND
ORDER REJECTING THE
REPORTS AND
RECOMMENDATIONS OF
THE MAGISTRATE JUDGE**

Thomas Calhoun-Lopez, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Andrew H. Mohring, Assistant Federal Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendants Michael D. Brown and Frederick W. Tibbetts.

Steve L. Bergeson, **TUTTLE BERGESON PETROS, P.A.**, 1275 Ramsey Street, Suite 600, Shakopee, MN 55379, for defendant Jerry A. Reyes.

Paul C. Engh, **PAUL ENGH LAW OFFICE**, 220 South Sixth Street, Suite 1225, Minneapolis, MN 55402, for defendant Marc. L. Lyons.

Defendants Michael Brown, Jerry Reyes, Marc Lyons, and Frederick Tibbetts were indicted for violating the Lacey Act by transporting and selling fish in violation of tribal law. 16 U.S.C. § 3372(a).[1] Defendants move to dismiss their respective indictments on the grounds that, as members of the Leech Lake and White Earth bands of Chippewa Indians, their right to fish on the Leech Lake Reservation is protected by the 1837 Treaty with the Chippewa ("1837 Treaty"), 7 Stat. 536, July 29, 1837, such that this federal prosecution violates their treaty rights. United States Magistrate Judge Leo I. Brisbois issued a Report and Recommendation ("R&R") in each case, recommending that the Court deny Defendants' motions to dismiss. Defendants objected to the R&Rs, and

---

[1] The Court addresses Defendants' motions to dismiss and treaty-based objections to the Reports and Recommendations in their respective cases in this consolidated memorandum opinion and order because the objections raise the same legal question: whether the indictments should be dismissed because prosecuting Defendants for the netting, sale, and transport of fish in violation of tribal law under the Lacey Act violates Defendants' fishing rights under the 1837 Treaty with the Chippewas. The order will distinguish between the cases by noting docket items in *United States v. Brown*, Cr. No. 13-68, as "Brown Docket," and docket items in *United States v. Reyes, et al.*, Cr. No. 13-70, as "Reyes Docket" (the Reyes Docket includes docket items for defendants Reyes, Lyons, and Tibbetts). This order does not address the remaining defendants in these cases: defendant Alan Hemme, (Cr. No. 13-70(4)), and Michael Nei, (Cr. No. 13-68(2)), as those defendants did not raise a treaty argument. The Court addresses a similar treaty-based argument in *United States v. Good*, (Cr. No. 13-72), but addresses Good's arguments in a separate memorandum opinion and order because the legal question presented by that case is not identical to that of these cases.

the Court will sustain the objections.  The Court will dismiss Defendants' indictments because the 1837 Treaty protects Defendants' right to fish on the reservation and Congress has not specifically abrogated that right.

## BACKGROUND

## I.    CHIPPEWA TREATY RIGHTS

Chippewa Indians occupied much of Minnesota and Wisconsin before European explorers and settlers arrived.  William Watts Folwell, *A History of Minnesota*, Vol. I, 10, 133-34, 159 (1956).  In the early 1800s, the United States sought to acquire native lands through cessation treaties, including much of eastern Minnesota and western Wisconsin in the 1837 Treaty.  *Id.* at 159-60.  The 1837 Treaty provided that the Chippewa Indians would cede these territories to the United States in exchange for cash and goods.  *See* 1837 Treaty, 7 Stat. 536, arts. 1-2.  The Treaty also provided that:

> The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States.

*Id.*, art. 5.   This "privilege" of hunting and fishing is generally referred to as a "usufructuary right – the right to make a modest living by hunting and gathering off the land."  *United States v. Bresette*, 761 F. Supp. 658, 660 (D. Minn. 1991).  A later treaty, signed in 1855, created the Leech Lake Reservation, which is one of seven Chippewa reservations in Minnesota.  Treaty with the Chippewa, 1855 ("1855 Treaty"), 10 Stat. 1165, Feb. 22, 1855; *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F. Supp.

1001, 1002-03 (D. Minn. 1971); *see also Cass Cnty., Minn. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 106 (1998).

Courts have consistently interpreted the 1837 and subsequent Chippewa treaties to preserve the Chippewa's hunting and fishing rights on the Leech Lake Reservation. In *Herbst*, the court held that these hunting and fishing rights were not extinguished by the Nelson Act of 1889, which permitted parcels from the reservation to be sold to white settlers. 334 F. Supp. at 1104-05; *see also Cass Cnty., Minn.*, 524 U.S. at 106-08 (purpose of allotment acts such as Nelson Act was to "assimilate Indians into American society and to open reservation lands to ownership by non-Indians"). The court held that the treaty-based hunting and fishing rights gave the Leech Lake tribe exclusive jurisdiction over hunting and fishing on the reservation such that state fishing and gaming laws did not apply to members of the tribe on the reservation. *Herbst*, 334 F. Supp. at 1004-06.[2]

Similarly, the Supreme Court in *Minnesota v. Mille Lacs Band of Chippewa Indians* held that the 1837 Treaty protected the right of Chippewa Indians to hunt and fish on the Mille Lacs Reservation. 526 U.S. 172, 196-202 (1999). There the State claimed

---

[2] The Minnesota Supreme Court has held similarly with regard to another Chippewa reservation: the White Earth Reservation. *State v. Clark*, 282 N.W.2d 902, 908-09 (Minn. 1979). There the court held that Chippewa Indians on the White Earth Reservation retained usufructuary rights because "it is clear from the record that hunting and fishing were an important part of the Chippewa's lifestyle and that the need to pursue these activities was a significant consideration in motivating them to negotiate with the government during this period of time. Moreover, the record reflects that for a considerable period after 1867 the White Earth Indians relied, in large part, upon hunting and fishing for their basic sustenance" and "hunting and fishing are a basic incident of reservation status." (footnote omitted) (citing *Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968))).

that language in the 1855 Treaty (which created the Leech Lake Reservation) stating that "'Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere,'" terminated any usufructuary rights the Chippewa may have had. *Mille Lacs Band*, 526 U.S. at 195 (quoting 10 Stat. 1166). But the Supreme Court found otherwise, observing that the treaty is "devoid of any language expressly mentioning – much less abrogating – usufructuary rights." *Id.* The Supreme Court also noted that the Senate chairman of the Committee on Indian Affairs at the time the 1855 Treaty was signed stated that the treaties would reserve to the Chippewa "those rights which are secured by former treaties," and that statements by a Chief of one band party to the treaty emphasized that the purpose of the treaty was the transfer of land, suggesting that "the Chippewa did not understand the proposed Treaty to abrogate their usufructuary rights as guaranteed by other treaties." *Id.* at 197-98 (internal quotations and citations omitted). The Court is persuaded, and the parties do not dispute, that the usufructuary rights named in the 1837 Treaty apply to the Leech Lake Band on the Leech Lake Reservation.

## II.    LACEY ACT

The Lacey Act was initially passed in 1900 as one of the first federal wildlife protection laws, outlawing interstate sale or transport of birds or other animals killed illegally in their state of origin. Lacey Act, 16 U.S.C. §§ 3371 *et seq.*; S. Rep. 97-123, at 2 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1748, 1749. Congress amended the Lacey Act

in 1981 to strengthen the Act's effectiveness as a wildlife law enforcement tool.  Lacey

Act Amendments of 1981, Pub. L. No. 97-79, 95 Stat. 1073.  In particular, Congress

added violations of tribal law to the possible grounds for violation of the Lacey Act:

> It is unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law . . . .

*Id.* § 3(a)(1) (codified at 16 U.S.C. § 3372(a)).  The Senate Report explained the rationale

for this addition:

> Because of the resource management responsibilities of Indian tribes, the legislation proposes that like the current Black Bass Act, the provisions of the [Lacey] Act apply to fish and wildlife taken in violation of Indian tribal law or regulations.

S. Rep. 97-123 at 4, 1981 U.S.C.C.A.N. at 1751.  The government brings the Lacey Act

charges here for alleged violations of tribal law.

## III.   INDICTMENTS

Defendants Brown, Reyes, and Lyons are enrolled members of the Leech Lake

Band of Chippewa Indians ("Leech Lake Band") and Defendant Tibbetts is an enrolled

member of the White Earth Band of Chippewa Indians.   (Indictment, Apr. 9, 2013,

Brown Docket No. 1; Indictment, Apr. 9, 2013, Reyes Docket No. 1.)  Defendants were

each charged with violating the Lacey Act, 16 U.S.C. § 3372, by transporting and selling

fish in violation of tribal law.  All Defendants are accused of taking fish by gill net from

lakes within the boundaries of the Leech Lake Indian Reservation, for commercial

purposes, in violation of the Conservation Code of the Leech Lake Band of Chippewa

Indians ("Conservation Code") sections 22.01(2) and 23.01.  (Indictment, Brown Docket No. 1; Indictment, Reyes Docket No. 1.)   Section 22.01 of the Conservation Code prohibits the taking of fish with gill nets except for personal uses.  Conservation Code § 22.01(2).   Section 23.01 of the Conservation Code prohibits the taking of fish for commercial purposes within the Leech Lake Reservation without a special permit. Conservation Code § 23.01.

Defendants each move to dismiss their indictments on the grounds that they cannot be prosecuted for fishing activities on the reservation because their right to fish on the reservation is protected by the 1837 Treaty.[3]  (Mot. to Dismiss the Indictment, June 20, 2013, Brown Docket No. 59; Mot. to Dismiss the Indictment, June 20, 2013, Reyes Docket Nos. 106, 118, 119.)

The Magistrate Judge issued R&Rs recommending that the motions to dismiss be denied.  (R&R, Aug. 14, 2013, Brown Docket No. 71; R&R, Aug. 14, 2013, Reyes Docket Nos. 147, 148, 149.)  Defendants object to the R&Rs, arguing that the Magistrate Judge analyzed the potential treaty conflict improperly and incorrectly concluded that the prosecutions could proceed because Defendants were not exempt from the prohibitions of the Lacey Act.  The Court now considers Defendants' objections to the R&Rs on the issue of the potential treaty conflict and concludes that Defendants' rights under the 1837 Treaty preclude federal prosecution under the Lacey Act.

---

[3] Defendants have filed other motions, including motions to dismiss for selective prosecution and motions to suppress certain statements.  The Court does not reach these issues because it dismisses the indictments based on Defendants' treaty rights.

## ANALYSIS

### I.  STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, a party may "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b)(1). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

### II.  MOTIONS TO DISMISS THE INDICTMENT

Defendants object to the recommendation of the Magistrate Judge that the Court deny Defendants' motions to dismiss their indictments. They argue that the R&Rs erroneously framed the relevant question as whether the 1837 Treaty exempts them from the Lacey Act and thus came to the incorrect conclusion that their prosecutions under the Lacey Act can proceed despite their Treaty rights. Defendants argue instead that the fishing rights under the 1837 Treaty insulate them from this federal prosecution under the Lacey Act because Congress has not specifically abrogated their rights provided in the 1837 Treaty.

#### A.  Method for Analyzing Potential Conflicts Between Treaties and Statutes

The dispute here begins with how the Court should approach the issue. The Government urges the Court to look first, and only, to the Lacey Act to conclude that the Lacey Act applies to Indians, including these Defendants. This mirrors the approach

- 8 -

employed by the Magistrate Judge.  The Magistrate Judge applied an analysis in which he first queried whether the Lacey Act applies to Indians.  After concluding that it did, the Magistrate Judge considered whether the Treaty specifically exempts Defendants from the Lacey Act, as, only then, after "a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, [does] the court next ask[] whether that treaty right was abrogated by Congress." (R&R at 4, 6, Brown Docket No. 71.[4])  Under this approach, which focuses on whether the Treaty exempts defendants from the Lacey Act, the Government argues that the 1837 Treaty rights are not at issue and do not affect the application of the Lacey Act to Defendants. (*See, e.g.*, Resp. to Objections to R&R at 2, Sept. 20, 2013, Docket No. 80. ("Treaty rights are not at play here."))

In contrast, Defendants urge the Court to follow the approach adopted by the Supreme Court in cases presenting a potential conflict between a treaty and a statute. (*See, e.g.*, Mem. in Supp. of Obj. to R&R at 2, 5-6, Sept. 3, 2013, Brown Docket No. 76 (citing *United States v. Dion*, 476 U.S. 734, 738 (1986).)  This approach involves determining first the scope of the treaty's protection – whether it protects the conduct at issue – and second whether Congress has specifically abrogated that protection.

The Supreme Court has made clear that if there is a treaty right that protects the relevant conduct, the question is whether Congress has abrogated that right, not whether the right has specifically exempted the party to the treaty from an Act that would

---

[4] The R&Rs in each case on this issue are nearly identical.

otherwise generally apply. *See Dion*, 476 U.S. at 737-40 (after determining that treaty rights included an exclusive right to hunt and fish on the land, determined whether Congress specifically abrogated those rights); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 689-90 (analyzing first the scope of protection under the treaty and second whether Congress specifically abrogated that protection), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979).

The Court will follow the approach adopted by the United States Supreme Court in *United State v. Dion*: first considering the scope of the 1837 Treaty's protection and then whether Congress has explicitly abrogated that protection.[5] This approach has been

---

[5] Some formulations of this approach involve a third inquiry – whether the prohibition at issue, here, the Lacey Act, is a nondiscriminatory conservation measure. *See Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 398 (1968). But that inquiry was necessary in *Puyallup* because the treaty rights at issue protected hunting and fishing "in common with" other citizens of the territory so "any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase 'in common with.'" *Puyallup*, 391 U.S. at 395, 403. Here, the treaty contains no language requiring the Chippewa to share their fishing rights "in common" with non-Indians. Rather, courts in this district have already held that the broad scope of the Chippewa's fishing rights on the Leech Lake Reservation precludes state regulation of tribe members' fishing and hunting. *Herbst*, 334 F. Supp. at 1006. Thus, the Court need not engage in this third inquiry because the treaty language does not contemplate that the Chippewa share their hunting and fishing rights with non-Indians. *See United States v. Bresette*, 761 F. Supp. 658, 664 (D. Minn. 1991) (rejecting government's argument that "a statute of general applicability may limit Indian treaty rights under *Puyallup* even if it is not a clear abrogation of those rights as required under *Dion*" finding that "the court [in *Puyallup*] interpreted the Indians' fishing rights to be in common with other groups," and therefore determined that "the particular conservation measures did not exceed the Indians' understanding of the treaty" (emphasis omitted)). In *Puyallup*, the Supreme Court determined that the treaty **did not** protect the Indians' exclusive right to fish in the manner and mode that the state prohibited, so there was no need to consider abrogation, but only whether those state regulations were valid conservation measures that did not discriminate against Indians. *Puyallup*, 391 U.S. at 395-403. Here, the Court concludes that Defendants **do** have a treaty-protected right to the fishing underlying the indictment, but Congress has not abrogated that right. Thus, there is no need to analyze whether the Lacey Act is a valid nondiscriminatory conservation measure, because even if it were, it cannot be applied to Defendants in violation of their treaty rights.

used widely by other courts analyzing potential conflicts between Indian treaty rights and federal criminal statutes. *See, e.g.*, *United States v. Gotchnik*, 222 F.3d 506, 509 (8th Cir. 2000) (determining that defendants "clearly possess the right to hunt and fish in the ceded territory" under the Bands' Treaty and that the right had not been abrogated, before considering whether the Boundary Waters Act offended the treaty rights by prohibiting use of motorboats and motor vehicles in the area).

Moreover, the Court has found no Supreme Court precedent, and the Government has presented none, endorsing an approach that looks for a treaty to **exempt** Indians from the application of federal law rather than for the federal statute to **abrogate** the treaty rights.[6]   Given that the 1837 Treaty pre-dates the Lacey Act (predating the present

---

[6] The only precedent endorsing such an approach is based on a different treaty. *See United States v. Sohappy*, 770 F.2d 816 (9th Cir. 1985).  There, the Ninth Circuit first determined that the relevant treaty, which granted hunting and fishing rights "in common with" other citizens of the territory, did not protect an exclusive right for the tribe to regulate hunting and fishing or for the defendant to engage in the prohibited conduct. *Id.* 818-20.  The court then proceeded to consider whether Congress intended the Lacey Act to apply to Indians, concluding that it did, and that the treaty did not exempt Indians from the Lacey Act. *Id.* at 818-21.  The Court is not persuaded that *Sohappy* provides precedent for inquiring into whether a treaty **exempts** the Chippewa from the Lacey Act, both because it addressed a different, less protective treaty right, and because it is inconsistent with the Supreme Court's directive in *Dion* that hunting and fishing treaty rights must be **abrogated** in order to not apply.

Although the Eighth Circuit may seem to have endorsed the exemption inquiry in *United States v. Stone*, 112 F.3d 971, 973-74 (8th Cir. 1997), by citing *Sohappy* for the proposition that "federal laws of general applicability are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question," *id.* at 974 (internal citations omitted), this reference to *Sohappy* is inconsistent with Supreme Court precedent requiring courts to consider abrogation rather than exemption. *See also United States v. Big Eagle*, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (referencing *Sohappy* to conclude that treaty did not protect Indian from prosecution for fishing on reservation of which he was not a member).  Moreover, the origin of this line of dicta in *Stone* lies in the general applicability of federal criminal laws on reservations, *see Stone*, 112 F.3d at 974 (citing *United States v. Burns*,

(Footnote continued on next page.)

version of the Act by almost 150 years), it would make little sense for the Treaty to specifically and affirmatively exempt its beneficiaries from the Act.  *Cf. United States v. White*, 508 F.2d 453, 456 (8th Cir. 1974) ("Generally, in the case of a conflict between an Act of Congress and a treaty, the one last in date must prevail.  However, a treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." (citation omitted)).

### B.      Conflict Between the Lacey Act and the 1837 Treaty

Within this framework for considering the potential conflict between the 1837 Treaty and the Lacey Act, the parties do not dispute that the 1837 Treaty fishing rights apply to Defendants' activity on the Leech Lake Reservation.  Rather, they dispute whether those rights encompass the netting and sale of fish and whether the Lacey Act applies to Defendants despite those rights.  The Court therefore must first determine the scope of the 1837 Treaty's protection – whether it encompasses the conduct at issue and whether it precludes federal enforcement of tribal law.  Second, the Court must determine whether Congress intended to abrogate any of these protections in passing the Lacey Act.

_____

(Footnote continued.)

529 F.2d 114, 116-17 (9th Cir. 1975)), where federal authority to enforce criminal laws that did not implicate treaty rights was unclear – not in the context of treaty-protected usufructuary rights.  *See Burns*, 529 F.2d at 116-17 ("federal statutes of general applicability that make actions criminal wherever committed," such as the crime of being a felon in possession of a firearm, apply to Indians on reservations unless a treaty states otherwise).  In contrast, "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests."  *United States v. White*, 508 F.2d 453, 455 (8th Cir. 1974) (footnote omitted).

### 1.    Scope of the 1837 Treaty's Protections

In the first part of this analysis, the Court must determine whether the 1837 Treaty protects Defendants' right to engage in the conduct underlying the indictments. Interpretation of Indian treaties is "guided by special rules of construction." *Gotchnik*, 222 F.3d at 509.  We are to "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Mille Lacs Band*, 526 U.S. at 196. Treaties are to be "interpreted liberally in favor of the Indians," *id.* at 194 n.5, and any ambiguities are to be resolved in the Indians' favor, *Winters v. United States*, 207 U.S. 564, 576-77 (1908).  *See also*; *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Bresette*, 761 F. Supp. at 661 ("It is axiomatic that Indian treaty rights are to be afforded a broad construction and, indeed, are to be interpreted as the **Indians** understood them because the Indians were generally unlettered and the government had great power over the Indians with a corresponding responsibility toward them." (emphasis in original)).

As a general matter, "Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress." *Dion*, 476 U.S. at 738.  These fishing rights are held individually by Defendants, as treaty rights can be asserted by individual tribe members. *Id.* at 738 n.4.  Specifically, the 1837 Treaty at issue here extends usufructuary rights to fishing on the Leech Lake Reservation to members of bands of Chippewa Indians.  *See*

*Mille Lacs Band*, 526 U.S. at 200; *Herbst*, 334 F. Supp. at 1003-04.  But the scope and extent of these rights is not so clear: do they include the right to fish by any method (such as gill net) and the right to sell the yield?  The Court is persuaded that the Treaty rights encompass both this method of catch and the sale of the fish, based on the understanding of the Chippewa at the time the Treaty was signed.

The 1837 Treaty was signed by the leaders of several bands of Chippewa Indians, along with representatives of the United States government after several days of negotiation that took place at Fort Snelling.  Lawrence Taliaferro, *Autobiography of Maj. Lawrence Taliaferro* 214, *in* 6 Minnesota Historical Collections (1864).  During the negotiations, Chippewa leaders expressed their desire to retain the right to hunt and fish on the ceded lands.  Chippewa leader Hole in the Day stated: "My father, in all the country we sell you, we wish to hold on to that which gives us life – the streams and lakes where we fish, and the trees from which we make sugar."  Henry Dodge, *Proceedings of a Council with the Chippewa Indians*, 9 Iowa J. Hist. & Pol. 408, 424 (1911).  Governor Henry Dodge of Wisconsin Territory, which in 1837 included all of the future State of Minnesota, later responded that "I will agree that you shall have the free use of the rivers and the privilege of hunting on the lands you are to sell, during the pleasure of your great father."  *Id.* at 427.  Another Chippewa leader, Flat Mouth, a chief from Leech Lake, stated:

> Your children are willing to let you have their lands, but wish to reserve the
> privilege of making sugar from the trees, and getting their living from the
> lakes and rivers as they have heretofore done, and of remaining in the
> country.  It is hard to give up the land.  It will remain and cannot be

> destroyed, but you may cut down the trees, and others will grow up.  You
> know we cannot live deprived of lakes and rivers.

*Id.* at 428.  Governor Dodge responded to this: "My friends, I have listened with great attention to your chiefs from Leech Lake.  I will make known to your great father your request to be permitted to make sugar on the lands, and you will be allowed during his pleasure to hunt and fish on them."  *Id.* at 429.

These statements strongly indicate that both the Chippewa and the representatives of the United States understood the Treaty to reserve to the Chippewa a broad right to fish as they had been accustomed – without restriction.  Notably, the Leech Lake Chief stated that the Chippewa wished to reserve the privilege of "getting their living from the lakes and rivers as they have heretofore done."  *Id.* at 428.  This is most reasonably understood to encompass the sale of fish, as to make a 'living' off of the lakes, Indians may have needed to sell or trade the yield.  As the court held in *Bresette*, "the Chippewa were part of the national and international market economy at the time of the treaties." 761 F. Supp. at 662 (citing *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420, 1424 (W.D. Wis. 1987) (the Chippewa "harvested resources for their own immediate, personal use and for use as trade goods in commerce")).  The court in *Bresette* found that the Chippewa's right to hunt and gather the feathers from birds encompassed a right to sell the feathers, finding that there was "ample evidence that the Chippewa understood that their hunting and gathering rights . . . encompassed the sale of their catch."  *Id.* at 662, 664-65 (treaty right precluded prosecution for sale of feathers under the Migratory Bird Treaty Act).

The negotiations and proceedings before the signing of the 1837 Treaty also indicate that the preservation of the Chippewa's right to fish came with no restrictions on the manner or method of catching fish.  Nothing in the proceedings or in the text of the 1837 Treaty suggests that the treaty-preserved privilege of fishing was so restricted.  And this right should not be limited to those methods actually used by the Chippewa at the time the Treaty was signed – certainly innovations in method and tools would enable the Chippewa to (and become necessary for them to) 'get[] their living from the lakes and rivers.'  Importantly, the 1837 Treaty contains no language limiting the right to the available methods at the time, it merely ensures that the privilege of fishing is "guarantied to the Indians."  7 Stat. at 537.

Although the Treaty protects this individual right to net and sell fish, it is not completely free from limit or restriction, as the tribe has the authority to regulate fishing. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335 (1983) ("[T]ribes have the power to manage the use of [their] territory and resources by both members and nonmembers."); *see also State v. Clark*, 282 N.W.2d 902, 909 (Minn. 1979) ("We note that, even though we hold that the state is without jurisdiction to regulate defendants' hunting and fishing activities within the White Earth Reservation, their activities will not go unregulated.  Like the Leech Lake Band, the White Earth Indians have adopted a comprehensive conservation code to regulate Indian hunting and fishing within the reservation.").  Here, where the Treaty language broadly guarantees the privilege of fishing to the Chippewa, this means that the tribe may regulate hunting and fishing by tribe members on the reservation to the exclusion of other jurisdictions, such as the state.

*Herbst*, 334 F. Supp. at 1006 (fishing rights on Leech Lake Reservation preclude application of state fishing regulations).  Certainly, the federal government can impose restrictions on tribe members' fishing on the reservation, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 594 (1977), but it can do so only by making clear its intent to abrogate their treaty rights.  *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968).  The Court turns next to whether Congress has in fact done so with the Lacey Act.

### 2.    Congressional Abrogation

Congress has the power to abrogate usufructuary treaty rights. *Rosebud Sioux Tribe*, 430 U.S. at 594.  The Court must therefore determine whether Congress has exercised its power to abrogate the 1837 Treaty's protections here such that the government may prosecute Defendants under the Lacey Act based on alleged violations of tribal law.

The Government argues that the Lacey Act applies to Indians, and that because it applies to Indians, Congress has abrogated any treaty-based fishing right.  As support, the Government cites *United States v. Sohappy*, which held that the Lacey Act could be enforced against Indians for fishing violations in the state of Washington despite treaty-based usufructuary rights, reasoning that "it is only reasonable to assume that Congress

intended the Lacey Act to encompass everyone, including Indians." *United States v. Sohappy*, 770 F.2d 816, 821 (9th Cir. 1985); *see also United States v. Big Eagle*, 881 F.2d 539, 540 n.1 (8th Cir. 1989) ("[T]he Lacey Act, by its terms and definitions, applies to Indian people." (citing *Sohappy*, 770 F.2d at 820-22)).   In *Sohappy*, the relevant treaty protected the right of Indians to hunt and fish at all "usual and accustomed places," but "in common with citizens of the Territory."   770 F.2d at 819 (quoting treaty language). The court's reasoning relied on a determination that "the Indians do not have any treaty reserved right to exclusive jurisdiction over such fishing matters."   *Id.* at 820 (emphases omitted).   Thus, the Lacey Act, applying generally to Indians, applied to the Indians in *Sohappy* because the treaty there did not protect an exclusive right to hunt and fish.   Here, the 1837 Treaty contains no language requiring that the hunting and fishing rights be shared, and has been interpreted as precluding state regulation of hunting and fishing by tribe members on the reservation.   *Herbst*, 334 F. Supp. at 1006 ("Indians have the right to hunt and fish and gather wild rice on public lands and public waters of the Leech Lake Reservation free of Minnesota game and fish laws.").[7]

Thus, the inquiry and analysis here is distinct from that of *Sohappy*:  the question is whether Congress intended the Lacey Act to apply even to Indians who hold fishing rights that are exclusive and **not** shared in common with non-Indians.   Certainly, the federal government has the authority to exercise jurisdiction to limit tribe members'

---

[7] The court in *Herbst* concluded, however, that the Leech Lake tribe did not have the exclusive jurisdiction to regulate fishing and hunting by **non-Indians**.   334 F. Supp. at 1006. This determination does not affect the analysis here, as Defendants are members of Chippewa tribes.

fishing and hunting, but in order to do so Congress would need to make explicit its intent to abrogate the treaty rights. *Rosebud Sioux Tribe*, 430 U.S. at 594.

Courts should conclude that Congress has abrogated treaty rights only if Congress has clearly expressed its intent to do so, as "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe*, 391 U.S. at 413 (internal quotation marks omitted); *see also South Dakota v. Bourland*, 508 U.S. 679, 687 (1993). Courts have been "extremely reluctant to find congressional abrogation of treaty rights" absent explicit statutory language, *Washington*, 443 U.S. at 690, as "Indian treaty rights are too fundamental to be easily cast aside," *Dion*, 476 U.S. at 738-39. The Supreme Court in *Dion* acknowledged that courts have applied differing standards as to the degree of clarity and specificity with which Congress must abrogate a treaty, but clarified that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 739-40. In making this determination, the plain text of the statute is preferred over other sources, but there is no per se rule against utilizing legislative history in determining whether Congress intended to abrogate the treaty. *Id.* at 739.

There is no indication in the text of the Lacey Act that Congress intended to abrogate Chippewa fishing rights under the 1837 Treaty. Rather, the Lacey Act includes a specific disclaimer that: "[n]othing in this chapter shall be construed as . . . repealing, superseding, or modifying any right, privilege, or immunity granted, reserved, or established pursuant to treaty, statute, or executive order pertaining to any Indian tribe,

band, or community."  16 U.S.C. § 3378(c)(2).  This plainly dispels any possibility that Congress intended to abrogate Defendants' fishing rights under the 1837 Treaty.  *Cf. Gotchnik*, 222 F.3d at 509 (finding that the Boundary Waters Act did not abrogate treaty rights to hunt and fish in relevant territory where the Act stated "[n]othing in this Act shall affect the provisions of any treaty now applicable to lands and waters which are included in the mining protection and the wilderness," (internal quotation marks omitted)).  The text of the Lacey Act includes another disclaimer that "[n]othing in this chapter shall be construed as . . . enlarging or diminishing the authority of any State or Indian tribe to regulate the activities of persons within Indian reservations."  16 U.S.C. § 3378(c)(3).  This specifically indicates that Congress did **not** intend to interfere with or abrogate the tribe's authority over hunting and fishing on the reservation and further dispels any possibility that Congress intended to abrogate any rights under the Treaty.

The legislative history also supports this conclusion.  The Senate Report on the 1981 amendments to the Lacey Act – the amendments which added tribal law as a basis for violation under the Act – acknowledges the lack of clarity at the time about the extent to which tribes and states exercised concurrent or exclusive jurisdiction on tribal lands:

> Nothing in this Act shall be construed as enlarging or diminishing the authority of any state or Indian tribe to regulate the activities of persons within the Indian reservations.  The Committee recognizes that there is a continuing controversy about the extent of state and tribal jurisdiction over resources within Indian reservations and regarding non-Indians on those reservations.  Nothing in this Act is intended to preempt whatever jurisdiction individual states may have over resources within Indian Reservations under existing law, nor is it intended to alter or change the existing authority of Indian tribes over resources within their reservations.

S. Rep. 97-123, 18, 1981 U.S.C.C.A.N. 1748, 1765 (internal citations omitted).  This suggests that Congress was aware that different Indian treaties provided various degrees of protection and exclusivity and that Congress did not intend its inclusion of tribal law as a basis for violation to disrupt or alter those varying degrees of protection.

Two provisions of the Lacey Act offer some basis upon which to argue that Congress intended the Act to empower the federal government to enforce tribal law limits on Indian hunting and fishing.  First and most obviously, the prohibitions include violation of "Indian tribal law" as a basis for a violation under the Act.  16 U.S.C. § 3372(a)(1).  Second, the enforcement section provides that "the Secretary may enter into such contracts, leases, cooperative agreements, or other transactions with any Federal or State agency, Indian tribe, public or private institution, or other person, as may be necessary to carry out the purposes of this chapter."  *Id.* § 3376(b).

But these provisions do not indicate any intent by Congress that the Act's prohibitions would apply to Indians holding exclusive treaty-based rights to hunt and fish or that Congress can enforce tribal law limits against such Indians.  Rather, the provisions are best interpreted as permitting and facilitating federal enforcement of tribal law violations in situations that would not offend treaty rights.  For example, this could include federal enforcement of tribal law against non-Indians on Indian land, over which tribes typically do not have exclusive jurisdiction.  *See, e.g.*, *Herbst*, 334 F. Supp. at 1006 (Leech Lake Indians hold "aboriginal fishing and hunting rights," but not the "exclusive right to regulate hunting and fishing of Indian and non-Indian alike on the reservation").  This could also include federal enforcement (in conjunction with tribes or states) of the

Lacey Act where fishing rights are held "in common" with non-Indians, as with the treaty rights in *Sohappy*. Nothing in the text or the legislative history suggests that the possibility of joint or concurrent enforcement **in some cases** indicates Congress's specific intent to abrogate treaty rights in cases where a tribe's fishing rights are exclusive, not shared. Thus, these provisions are not rendered superfluous under the Court's interpretation that the Lacey Act did not abrogate the 1837 Treaty rights and therefore does not permit federal prosecution for violations of tribal fishing law. Neither provision contains the kind of explicit recognition of the treaty rights and choice to abrogate them required by *Dion*. *See Dion*, 476 U.S. at 739-40.

In light of the express disclaimers that the Act does not affect treaty rights and the legislative history's acknowledgment of the uncertain state of tribal and state jurisdiction at the time, the best interpretation of the Lacey Act as a whole is that Congress intended all extant treaty rights to remain intact. Where treaty rights do not preclude concurrent regulation of fishing and hunting by tribe members on the reservation, the Lacey Act would provide for federal enforcement of tribal law, but not where a treaty protects exclusive hunting and fishing rights for its members, as with the Chippewa's 1837 Treaty rights.

## CONCLUSION

The Court concludes that Defendants' rights under the 1837 Treaty preclude their prosecution under the Lacey Act. The 1837 Treaty protects Defendants' right to engage in the conduct underlying the indictment, unless limited by tribal law, and Congress has

not abrogated that right.  Although Congress could enable the federal government to enforce the Leech Lake Conservation Code through the Lacey Act, it has not explicitly stated its intent to do so.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **SUSTAINS** Defendants' objections [Cr. No. 13-68, Docket No. 75; Crim. No. 13-70, Docket Nos. 157, 158, 162] and **REJECTS** the Report and Recommendations of the Magistrate Judge [Crim. No. 13-68, No. 71; Crim. No. 13-70, Docket Nos. 147, 148, 149] in accordance with the above Memorandum Opinion.  Accordingly, **IT IS HEREBY ORDERED** that:

1.    Defendant Brown's Motion to Dismiss the Indictment [Cr. No. 13-68, Docket No. 59] is **GRANTED**.

2.    Defendant Brown's Motion to Dismiss the Indictment Due to Selective Prosecution [Cr. No. 13-68, Docket No. 58] is **DENIED as moot**.

3.    Defendant Brown's Motion to Suppress July 23, 2011 Statements, Admissions, and Answer [Cr. No. 13-68, Docket No. 55] is **DENIED as moot**.

4.    Defendant Brown's Motion to Suppress Evidence Obtained as a Result of July 23, 2011 Search and Seizure [Cr. No. 13-68, Docket No. 57] is **DENIED as moot**.

5.    Defendant Reyes' Motion to Dismiss the Indictment [Cr. No. 13-70, Docket No. 118] is **GRANTED**.

6.      Defendant Reyes' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Cr. No. 13-70, Docket No. 93] is **DENIED as moot**.

7.      Defendant Reyes' Motion to Suppress Admissions or Confessions [Cr. No. 13-70, Docket No. 96] is **DENIED as moot**.

8.      Defendant Reyes' Motion for Extension of Time to File Objections to Report and Recommendation [Cr. No. 13-70, Docket No. 153] is **GRANTED**.

9.      Defendant Lyon's Motion to Dismiss the Indictment [Cr. No. 13-70, Docket No. 106] is **GRANTED**.

10.      Defendant Lyon's Motion to Strike Surplusage [Cr. No. 13-70, Docket No. 107] is **DENIED as moot**.

11.      Defendant Lyon's Motion to Suppress Statements [Cr. No. 13-70, Docket No. 114] is **DENIED as moot**.

12.      Defendant Tibbetts' Motion to Dismiss the Indictment [Cr. No. 13-70, Docket No. 119] is **GRANTED**.

13.      Defendant Tibbetts' Motion to Dismiss the Indictment Due to Selective Prosecution [Cr. No. 13-70, Docket No. 116] is **DENIED as moot**.

14.      Defendant Tibbetts' Motion to Suppress July 23, 2011 Statements, Admissions and Answers [Cr. No. 13-70, Docket No. 104] is **DENIED as moot**.


DATED:  November 25, 2013          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                              United States District Judge